UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
WILLIAM KANE,

Plaintiff,

-against-

CNN AMERICA, Inc.; TIME WARNER Inc.; TURNER
BROADCASTING SYSTEM, Inc.; CABLE NEWS
NETWORK, Inc.; JOHN SILVA; WILLIAM McLOUGHLIN;
and  ANNE WOODWARD, in their personal and professional
capacities,

Defendants
--------------------------------------------------------------------------X

**COMPLAINT**

**TRIAL BY JURY**

**Docket No.**

The Plaintiff, William Kane, by his attorneys, AVALLONE & BELLISTRI, LLP,

complains of the Defendants and allege as follows:

## NATURE OF ACTION

1.    This is an action for declaratory relief, pecuniary and punitive damages to secure

protection of, and to redress deprivation of Plaintiff's rights secured by the United States

Constitution, Title VII of the Civil Rights Act of 1964, as amended, American with

Disability Act (ADA), the First Amendment, New York State Executive Law § 296, Fair

Labor Standards Act, New York State Labor Law, New York City Administrative Code §8-

107 and New York State Common Law providing for the harms done to the Plaintiff as a

result of the Defendants' actions engaging in discrimination based upon gender, gender

identity and expression, sexual orientation, disability as well as Defendants' creation of a

hostile work environment, sexual harassment, and retaliation for Plaintiff's disclosure of

wrongdoing and complaints concerning Defendants' acts of discrimination.

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked based upon federal question and pursuant to the Constitution of the United States, Title VII, ADA, the New York State Constitution, New York State Human Rights Law §296 et seq., 28 U.S.C. §§ 1331, 1343(3) and (4), 28 U.S.C. § 1331, New York City Human Rights Law §8-107 of the Administrative Code as well as 42 U.S.C. § 2000e through § 2000e (15).

3.     This Court has supplemental jurisdiction over the Federal claims pursuant to 28 U.S.C. § 1367.

4.     Compensatory and punitive damages are sought pursuant to 28 U.S.C. §§2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

5.     Cost and attorney's fees may be awarded pursuant to 29 U.S.C. §621 et seq., and Rule 54 of the federal Rules of Civil Procedure.

6.     Jurisdiction is also invoked under the doctrine of pendant jurisdiction with respect to any and all state claims set forth in all counts.

7.     Venue properly lies in this district under 28 U.S.C. §1391 (a), (b) and (c) and 29 U.S.C. §621 et seq., this being the District were Plaintiff resides in Queens County and Defendants conducts business in the Eastern District by transmitting their CNN cable channel in the Eastern District.

8.     The rights, privileges and immunities sought herein to be redressed are those secured in the provisions against gender/sexual orientation discrimination and anti-retaliation provisions under Title VII of the Civil Rights Act of 1964, as amended, American Disability Act (ADA), U.S.C. §1983, along with applicable provisions of the

New York State Human Rights Law, New York State Executive Law § 296, Fair Labor Standards Act, New York State Labor Law, New York State Common Law, and New York City Human Rights Laws and Administrative Code §8-101 et seq..

## **JURY DEMAND**

9.    The Plaintiff demands a trial by jury on each and every one of his claims as pled herein.

## **SATISFACTION OF PREREQUISITES UNDER TITLE VII**

10.    On or about August 9, 2013, Plaintiff, in accordance with applicable law, filed a Verified Charge with the United States Equal Employment Opportunity Commission ("EEOC"), which organization receives and investigates charges of discrimination as set forth by the Federal Anti-Discrimination Laws, including Title VII of the Civil Rights Act, as amended.

11.    Said Verified Charge charged that Defendants engaged in unlawful employment discrimination practices based upon gender and retaliation for engaging in protected activity, and the creation of a hostile work environment.  EEOC assigned Charge Number 520-2013-02950.

12.    On or about February 26, 2014, Plaintiff filed a Supplemental Charge of discrimination based on disability and failure to give a reasonable accommodation.

13.    The EEOC issued a "Right to Sue" Letter advising Plaintiff of the completion of his prerequisites to file suit in federal court dated February 26, 2014.  Copy attached.

## THE PARTIES

14.     Plaintiff, WILLIAM KANE, is a male homosexual citizen of the United States of America, and is over twenty-one (21) years of age, a resident of Queens County, State of New York.

15.     At all relevant times, Plaintiff was an employee of Defendants CNN AMERICA, Inc.; TIME WARNER Inc.; TURNER BROADCASTING SYSTEM, Inc.; and/or CABLE NEWS NETWORK, Inc. (hereinafter referred to collectively as "CNN") at all relevant times as a studio operator.

16.     Defendant, CNN AMERICA, Inc. is a corporation organized under the laws and state of Delaware in 1987 and conducts business within the Eastern District of New York.

17.     CNN AMERICA, Inc. provides business, technology, entertainment, sports, travel, and weather news within the Eastern District of New York and is based in Atlanta, Georgia. CNN America, Inc. operates as a subsidiary of Defendant Cable News Network, Inc.

18.     Defendant CNN AMERICA Inc. at all relevant times employed more than fifty (50) employees.  At all relevant times, CNN America Inc. was Plaintiff's employer.

19.     Defendant TIME WARNER Inc., is a corporation organized under the laws and state of Delaware and is domiciled in the State of New York having its place of business at One Time Warner Center, New York, New York 10019.

20.     At all relevant times, Time Warner Inc. conducts business in the Eastern District of New York and has at all relevant times employed more than fifty (50) employees.

21.     At all relevant times, Time Warner Inc. was Plaintiff's employer.

4

22.   Defendant, TURNER BROADCASTING SYSTEM Inc. (hereinafter referred to as "TBS") is a corporation organized under the laws and state of Delaware and an American media conglomerate and subsidiary of Defendant Time Warner and now operates as a semi-autonomous unit of Time Warner. Defendant Turner Broadcasting System Inc. controls and manages Co-Defendant CNN, one of its subsidiary companies.

23.   Defendant TBS conducts business within the Eastern District of New York though it's subsidiary company.

24.   Defendant TBS has at all relevant times employed more than fifty (50) employees.

25.   At all relevant times, TBS was Plaintiff's employer.

26.   Defendant, The CABLE NEWS NETWORK Inc. ("CNN") is an American basic cable and satellite television channel that is owned by the Defendant TBS, a division of Defendant Time Warner Inc. CNN is a subsidiary of Cable News Network Inc.

27.   Defendant CNN telecast its news programs within the Eastern District of New York and conducts business within the Eastern District of New York.

28.   At all relevant times, Defendant CNN was Plaintiff's employer.

29.   Defendant CNN has at all relevant times employed more than fifty (50) employees.

30.   Defendant JOHN SILVA, (hereinafter referred to as "Silva"), was at all relevant times a manager and employee of the defendant companies and plaintiff's direct supervisor.

31.    Defendant, WILLIAM McLOUGHLIN, (herein referred to as "McLoughlin"), was at all relevant times a manager and employee of the defendant companies and plaintiff's direct supervisor.

32.    Defendant, ANNE WOODWARD, (hereinafter referred to as "Woodward"), is Vice President of CNN Technical Operations, an employee of the defendant companies and at all relevant times Plaintiff's supervisor.

## BACKGROUND

33.    Plaintiff, William Kane (hereinafter referred to as "Plaintiff"), is a gay male.

34.    On or about October 2001, Plaintiff began to work at CNN studios in New York as a freelancer being employed by a company called "Potomac" with union NABET, a third party company which was ultimately outsourced by CNN.

35.    On or about early 2002, Plaintiff began to work on a new CNN show called "American Morning" with Paula Zahn while being employed by Potomac and later "Team Videos".  Plaintiff's manager/supervisor was Defendant Silva.

36.    On January 17, 2004, Plaintiff officially became a staff employee of CNN in the NY Technical Operations Department.

37.    At no time while employed with Defendants (from 2004 to July 2013), has there ever been a dress code in Plaintiff's department.

38.    From January 17, 2004 to 2008, Plaintiff remained assigned to the "American Morning" Show with morning schedules working with high-profile CNN journalists such as Paula Zahn and Soledad O'Brien as an "A2" which is the individual responsible for the microphones on the set.

39.    Sometime in 2008 Plaintiff was reassigned to the later afternoon shifts until his termination.  During the afternoon shifts Plaintiff worked with Director Renee Cullen, whom Plaintiff had worked with before, and high-profile CNN journalists such as Paula Zahn, Cambell Brown, Piers Morgan and CNN Domestic & International journalist Christiane Amanpour as an "A2" before revealing his sexual orientation to his managerial department at CNN.

40.    Plaintiff was selectively hand-picked by the most elite CNN Director, Mr. Cohen to work on his shows throughout his employment with Defendants prior to revealing his sexual orientation to Defendant Silva.

41.    By the time of Plaintiff's unlawful termination in July 2013, he had become the most senior "A2", having worked at that position for over 10 years.  Because of Plaintiff's experience and seniority as an "A2", he was giving the responsibility of training all new department employees who would be assigned as an "A2" by Defendant McLoughlin.

42.    Based on Plaintiff's seniority and experience as an "A2", he was placed on all important projects and shows at CNN and working with the most prominent CNN journalist.

43.    From 2001 to August 28, 2012, Plaintiff never revealed to anyone in his department at CNN-NY Technical Operations that he was a gay male except to CNN Human Resource Department, to former CNN employee Ms. Roni Pollack (inside her office with her door closed at the request of Plaintiff to protect his personal, private life and sexual preference regarding obtaining health care benefits for his then partner of approximately 6 years.  Said conversation was considered confidential.

44.    Prior to October 2012, Defendants did not have any written rules regarding a dress code for employees.

45. Plaintiff wore, on many occasions, bright colored shirts to work. In fact, on or about 2004, Plaintiff had to take his CNN ID card picture, while wearing a long sleeve bright pink shirt. He has worn this specific Italian Designer bright pink shirt at work at CNN on many occasions without ever being told it was inappropriate prior to October 2012.

46. For over 8 years, 2004 to July 1, 2013 (his last day as an active, paid CNN employee), at no time did Defendants ever tell Plaintiff to re-take his CNN ID Photo where Plaintiff is wearing a hot pink designer shirt or that it was against any written dress code to wear said shirt to work.

47. From approximately 2002 - 2008, CNN's NY Technical Operations Department voluntarily took part in a tradition wherein CNN employees wore bright colorful shirts on Thursdays, including the Plaintiff, co-workers, producers, make-up artist(s), and supervisors/managers i.e. Shane Touhey (studio camera operator), Louis Dellipaoli, (studio camera operator), Philip Pernice (studio camera operator and "A2") , Brad Fehl (studio camera operator), John Reilly (studio camera operator), Gary D'Orio (studio camera operator), Ronald Baxter (studio camera operator), Gerald Kaufold (audio designer,), Rochelle Weithorn (CNN make-up artist), Jessie Logan (producer and freelancer,), and Lawrence Van Patten (CNN-NY Technical Operations supervisor), without ever being told that they need to stop wearing these bright color shirts to work or to take them off and wear less colorful clothes.

48. In fact, on many occasions, Plaintiff's supervisor, Mr. Van Patten would fill in for Plaintiff during a live show, while wearing very colorful Hawaiian shirts, so that Plaintiff could take a restroom break.

49. Between 2004-2009, Plaintiff had not disclosed to anyone at CNN or outside of CNN that he was gay to any CNN employee.

50.   In 2010, Defendants asked Plaintiff to participate in an online internal website profile for the NY Technical Operations Department to be viewed by other CNN bureaus, such as Atlanta and Washington, D.C.  The photos of the Plaintiff were taken inside CNN's Studio 52 at CNN's New York Office.  After reporting to "Hair and Makeup", Plaintiff was allowed to wear a bright red track suit jacket for the CNN online profile picture, which he also wore for his entire 8 hour shift at CNN and was never asked to change or cover up his attire.

51.   Plaintiff was never told to remove the jacket for the CNN online pictures and soon thereafter CNN published the photo on their web site depicting Plaintiff wearing bright color clothes nationwide.

52.   Plaintiff has worn the same bright red sweat suit to work and during his 8 hour shifts on many occasions at CNN prior to October 2012 without ever being told to remove and change his clothes or warned by any supervisor that the bright colored clothes were inappropriate in the workplace.

53.   On or about April 14, 2010, Plaintiff wore a bright pink colored soccer jersey to work at CNN and during his 8 hour shift.  At no time was he ever told to change his clothes or refrain from wearing the bright pink color soccer jersey to work in the future or that it was inappropriate to wear to work at CNN by any supervisor.

54.   On or about April 27, 2010 Plaintiff wore a bright neon green soccer jersey to work at CNN and throughout his 8 hour shift without ever being told that he had to change his shirt or refrain from wearing it in the future, or that it was inappropriate for work.

55.   On or about November 29, 2010, Plaintiff wore a bright blue tracksuit to work at CNN and throughout his 8 hour shift without ever being told that he had to change his clothes or refrain from wearing it in the future, or that it was inappropriate for work.

56.   On or about April 12, 2011, Defendant McLoughlin offered Plaintiff a bribe of $100.00 in cash "to go to TJ Maxx" if Plaintiff would agree to change out of his blue track suit because McLoughlin alleged that journalist Mr. Piers Morgan said that it was a distraction to him.

57.   Plaintiff refused the aforementioned $100.00 cash bribe.  Instead of accepting such bribe, the Plaintiff went to his locker and placed his black CNN sweatshirt over his blue track suit.

58.   Journalist, Piers Morgan denied ever complaining to anyone that Plaintiff's attire was a distraction.  Mr. Morgan invited Plaintiff into his office.  While in the office, Plaintiff indicated to Mr. Morgan "Piers, I was told that my track suits were a distraction to you" Mr. Morgan replied "Who said this?" Plaintiff responded that it was his direct manager, "McLoughlin" and Mr. Morgan stated to Plaintiff "I never said this. I love your track suits." Mr. Morgan told Plaintiff that he liked his tracksuits because he was a big soccer fan and encouraged Plaintiff to continue to wear them in front of Plaintiff's colleagues stating exactly inside CNN-NY's Studio 71, where his studio aired, "I want Billy to wear the brightest colored clothing when working on my show."

59.   On or about April 24, 2012, Plaintiff wore a bright yellow Adidas tracksuit to work at CNN and was allowed to work his 8 hour shift without any complaints or warning being issued by any supervisor of the Defendant companies.  Plaintiff has worn this athletic track suit and others of similar color to work on many occasions prior to this day without ever being told that it was inappropriate.

60.   As of August 28, 2012, Plaintiff had still not informed anyone in his department of his sexual orientation except in a prior confidential conversation with Human Resources regarding health benefits for his then partner.

61.   On or about September 20, 2012, Plaintiff wore a bright red Adidas soccer tracksuit to work with matching sneakers.  Plaintiff wore the tracksuit during his 8 hour shift without ever being asked to change his clothes or that it was inappropriate to wear such clothes.

62.   On September 20, 2012, Plaintiff overheard a staff employee, Jay Conroy, make inappropriate sexual comments about a female colleague and friend, Jodi Dresch, to another CNN worker/freelancer, i.e. "How much would it take to have sex with Jodi Dresch?" Plaintiff reported the inappropriate sexual comments that were made by Jay Conroy to Ms. Dresch.  Ms. Dresch told Plaintiff that the same inappropriate conversation occurred in Studio 71 by Jay Conroy, only this time it was in reference to Oprah Winfrey, i.e. "How much would it take to have sex with Oprah?"  Ms. Dresch told Plaintiff that she did not appreciate the comments and felt that it was insulting and inappropriate.

63.   Ms. Dresch told Plaintiff that she had complained to defendant McLoughlin in the past (approximately 2004) about Mr. Conroy but nothing was ever done about it, according to Dresch, "this is why years later this type of inappropriate, sexual discussion continues."

64.   As a result of Plaintiff telling Ms. Dresch of the inappropriate comments, Human Resources were notified by Ms. Dresch and Mr. Conroy and Ms. Dresch were interviewed.

65.   On September 24, 2012, Plaintiff was interviewed by Ms. DuMond of Human Resources regarding what he heard in Studio 71 from Jay Conroy.  Plaintiff was hesitant to

cooperate because of fear of retaliation. Plaintiff eventually cooperated and told HR what he heard and also help HR obtain the computerized schedules for that day after the managerial staff of Technical Operations (Plaintiff's Department) could not produce the crew schedule.

66.    On or about October 18, 2012, Plaintiff wore a black Mariachi suit to work and wore it for the duration of his 8 hour shift. Plaintiff was never asked to change his clothes, cover it up or not to wear it in the future. In fact, Plaintiff received many compliments including CNN Journalist, Fareed Zakaria, who wore Plaintiff's sombrero because he was doing a story that day called "Misconceptions of Mexico" on his "GPS" ("Global Public Square") show on CNN International. Mr. Zakaria personally asked Plaintiff to follow him to meet his executive producer which the Plaintiff was "proudly shown off" and Zakaria stated "Isn't this suit incredible?"

67.    Mr. Clayton Sizemore, CNN-NY Technical Operations manager complimented Plaintiff for wearing the mariachi suit and said "Well, I just love it. Keep it up." and patted him on the back. At no time did Mr. Sizemore ever tell Plaintiff not to wear the suit again. CNN Journalist, Christiane Amanpour, also asked Plaintiff to take a photo of her and Plaintiff together. Said photo was taken by Technical Director Chris Brown. Said photo was later used by CNN journalist Ms. Amanpour on her official Twitter.com page unbeknownst to the Plaintiff.

68.    At no time did Plaintiff ask anyone to take his photo while wearing the mariachi suit but rather CNN journalist and management personnel initiated the taking of the photos.

69.    One of the Photos with Christiane Amanpour and Plaintiff was posted on the CNN-NY's Technical Operations bulletin board, crew room.

70.   October 18, 2012, one of Plaintiff's supervisors, Ms. Amy DeStefan wrote an email to the Plaintiff while at work at CNN, that she "loved the suit…"

71.   Plaintiff was also invited to meet Mr. Piers Morgan in his office on the 7th floor wherein Mr. Morgan complimented Plaintiff on wearing the mariachi suit in the presence of a co-worker, Jodi Dresch.   Soon thereafter on that same day of October 18, 2012, Plaintiff worked with CNN Journalist Erin Burnett.   Ms. Burnett invited Plaintiff into her office and told him that she loved the suit that it was not a distraction to her and that he was the "best dressed man" on her show and proud of him in the way that he represented her show while meeting and greeting the on-air guests of her CNN show.

72.   Later that day on October 18, 2012, Plaintiff made a long distance telephone call to Mexico during his lunch break using a CNN phone in order to speak to his fiancé, Ernesto Lopez Rosales, to inquire about his sister who was ill.   Other employees had used this phone to call overseas in the past without any problems or warnings from Management.

73.   Soon thereafter, Defendant Silva approached Plaintiff and asked why he called Mexico.   Plaintiff informed Silva that he was talking to his fiancée.   Silva immediately congratulated Plaintiff on his engagement and asked "what's her name?" As Silva was shaking Plaintiff's hand, Plaintiff stated that there was no "her" and rather a "he" and proceeded to tell Defendant Silva, for the first time, that he was gay.

74.   Defendant Silva told Plaintiff that he should not use the phone to make overseas calls.   Plaintiff told Silva that other employees use it to make overseas calls and that Defendant Silva himself has used CNN telephones to make overseas calls to his parents in Portugal; A makeup artist (Leah Tamburino) used the phone to call Greece to speak with her family and Defendant McLoughlin had asked Plaintiff in the past to call Italy to help Chris

13

Adair, a CNN Director, to make arrangements for her honeymoon.  Furthermore, co-worker, Jodi Dresch, has in the past telephoned her daughter in Italy from the Company telephone system.

75.    Plaintiff told Defendant Silva that he was being singled out and that if it was a problem Plaintiff could speak to Mr. Lewis Strauss, the department's head manager, to explain Plaintiff's position and his observations of other CNN employees using the phones for overseas calls.  Silva said "Don't worry about it, I'll take care of it."

76.    On October 18, 2012 despite the numerous compliments from CNN journalists and supervisors, Defendant Silva approached Plaintiff near Studio 51 and told him that he didn't want Plaintiff to wear his mariachi suit and that he [Silva] was aware that Plaintiff owned a yellow mariachi suit and did not want Plaintiff to wear it to work because it was "too flamboyant for a male in our department" and that Plaintiff would be better suited in the "Entertainment or Make-Up Department."

77.    Plaintiff did not appreciate being called "flamboyant" and asked to transfer to the entertainment or make-up department nor has anyone ever called him or referred to him as flamboyant prior to telling Silva that he was gay.  Plaintiff refused to be stereotyped and accept a transfer to the "Entertainment or Make-Up Department."

78.    Plaintiff asked his supervisor, Silva if CNN had a dress code and Silva responded "I don't know." Plaintiff then responded, "If you don't know the dress code or if there even is a dress code, then why are we having this discussion and you warning me about wearing yellow, especially when I've worn the color yellow, in a full yellow track, yellow shoes and even a yellow hat to work for an 8 hour shift for so many years and never once have

you ever said anything until now; only days after I opened up to you about my same-sex engagement."

79.   Defendant Silva thought Plaintiff was better suited for the "Entertainment or Make-Up Department" because of the stereotypical belief that there are more homosexuals in the entertainment and/or makeup department at CNN.  Plaintiff told Silva that he was insulted by his comments about "being better suited in the Entertainment or Make-Up Department."

80.   Such comment by Defendant Silva was inappropriate and stereotypical in that it would be insulting to any male, heterosexual person who works in the Entertainment or Make-Up Department.

81.   Prior to telling Defendant Silva that he was gay, Plaintiff was never asked to not wear yellow or bright colored suits, which he had done on many occasions for many years.

82.   Plaintiff became very emotionally upset based on what Defendant Silva said to him.  This was witnessed by Adam Gable, a lighting designer for "LDG" who works at CNN, walked in to the Studio 51 area and heard the conversation.  The next day Mr. Gable spoke with Plaintiff and expressed his compassion to the Plaintiff, saying "If it's any consolation, I just want to say sorry and you have my sympathy." This was witnessed by co-worker Jodi Dresch.

83.   Mr. Gable's statement was stated in the presence of co-worker Jodi Dresch, as she was also comforting the Plaintiff whom was still suffering mentally and emotionally from Silva's comments.

84.   As a result of this incident with Defendant Silva, many of plaintiff's co-workers became aware of Plaintiff's sexual orientation despite plaintiff's desire to not divulge his personal life to his co-workers; yet said information was revealed.

15

85.   Plaintiff subsequently became aware that details pertaining to his sexual orientation and the incident with Defendant Silva were further revealed by Defendant McLoughlin while in Washington, D.C., per Mr. Shane Touhey.

86.   Mr. Touhey later stated to the Plaintiff, that in his opinion, "Silva was totally in the wrong for what he did. If you want, I'll talk to him..." The plaintiff wanted the issue to go away and people at CNN not having discussions about his sexual orientation as the Plaintiff did not want everyone to know, but rather only individuals on a need to know basis, i.e. Human Resources.

87.   Sometime thereafter, Plaintiff went to speak with Erin Burnett who noticed that Plaintiff had been crying and asked him what happened?  Plaintiff told Ms. Burnett what Silva said to him and that he had told Silva that he was gay and how he has been harassed ever since said disclosure.  Ms. Burnett closed her door to her office and attempted to console Plaintiff and stated that she was very upset on how Plaintiff was being treated.  She then asked for the name of Plaintiff's supervisor; and how to spell it and what was his phone number? She told Plaintiff that she would take care of it.

88.   On October 18, 2012, after Defendant Silva left Plaintiff alone inside studio 51, Plaintiff emailed Josette Sprott, a CNN-NY Human Resources manager if he could meet with her the following day to discuss a very important matter. The plaintiff did not state in his email to Sprott the nature of the need for a meeting, as the Plaintiff didn't even want to write in a Company email (at this time) anything in writing regarding his sexual orientation in respects to his personal, private life.

89.    On October 18, 2012 at approximately 8:15 pm, Defendant Silva brought Plaintiff into the audio booth outside Studio 51 and attempted to apologize for prior statements and begged Plaintiff not to file a complaint with Human Resources.

90.    Plaintiff told Silva that he had already complained to Human Resources and that a meeting was set up for October 19, 2012.  At this point, Defendant Silva offered Plaintiff a bribe of extra overtime indicating Plaintiff could have "as many hours as you want" if he didn't complain to Human Resources.  Plaintiff refused Silva's bribe to stay quiet.

91.    As a result of this second meeting with Defendant Silva on October 18, 2012, Plaintiff was forced to stay late past his scheduled departure time and was entitled to two (2) hours of overtime.

92.    Despite being told that he would receive overtime by Ms. Janet Sheskin, the payment was never made resulting in Plaintiff having to make a complaint to the NYS Department of Labor's, Ms. Millie Rodriguez.

93.    On October 19, 2012 the aforementioned instances with Defendants Silva and McLoughlin were reported by Plaintiff to Ms. Maureen DuMond and Josette Sprott at Human Resources.  Ms. DuMond told Plaintiff that she and her team would investigate the claims he made against Defendants and would report back to him in 1 week.

94.    On November 3, 2012, after approximately 2 weeks had passed without receiving any communication from Ms. DuMond or Human Resources, Plaintiff submitted a report to Defendant Time Warner's Compliance Hotline to make a complaint against the CNN Human Resource Department.

95. On November 5, 2012, Plaintiff telephoned Time Warner's Compliance Hotline to follow-up on his initial complaint since he was yet to receive any updates as promised by H.R.

96. Soon thereafter, on November 5, 2012 Ms. Mary Hutchinson, Director of CNN-NY Human Resources, met with Plaintiff regarding the various complaints that he had filed up to that date and told Plaintiff that they substantiated many issues such as Silva's usage of "flamboyant" directed at Plaintiff and his comment that Plaintiff transfer to the entertainment and make-up department.  Ms. Hutchinson informed Plaintiff to "rest assured the proper disciplinary action has been taken" without specifying what action was taken.

97. During Plaintiff's meeting with Ms. Hutchinson, she told Plaintiff that being called or referred to as "flamboyant" was completely inappropriate and unacceptable to be used to describe any CNN employee.

98. Plaintiff told Ms. Hutchinson that he feared of being retaliated by Defendant Silva and Defendant McLoughlin or other managerial staff in his department based on Plaintiff witnessing retaliatory conduct against a former CNN employee, Gilbert Martinez who had gone to HR to file complaints in the past.

99. On or about November 8, 2012, Plaintiff received an e-mail from Ms. DuMond stating that Human Resources had concluded its investigation but void of any specific information other than that they wanted to speak to Plaintiff about the October 18, 2012 incident and other incidents (Dresch-Conroy incident) which occurred prior to October 18, 2012 that Plaintiff had discussed with Human Resources.

100. On or about November 2012, Plaintiff called his fiancée in Mexico using his own cell phone and a pre-paid calling card.

101. Soon thereafter, Defendant Silva called Plaintiff to come to the managerial cubicles and from there walked Plaintiff into the Director of Studio Operations office (McLoughlin's Office) which was unoccupied, and closed the door.

102. Defendant Silva began to yell and bang his hands repeatedly on the table screaming at Plaintiff for having called his fiancée in Mexico and talking in Spanish. This caused Plaintiff to become emotional and cry.

103. While Silva was yelling and screaming at Plaintiff in the McLoughlin's office, he would not allow Plaintiff to leave until Plaintiff had stopped crying despite repeated requests that Silva open the door.

104. Plaintiff felt trapped in a room with Silva against his will and threatened that he would not let Plaintiff out until Plaintiff stopped crying. Plaintiff told Silva to leave him alone and that he was not doing anything different than anyone in the department and was never treated in this manner prior to telling Silva that he was gay.

105. Plaintiff again requested that Defendant Silva "Open the door." Defendant Silva stated "Not until you stop crying." The plaintiff responded "You made me cry. I don't care if people see me crying. If they ask, they will know why -- because of you and your harassment." Silva eventually did open the door and the Plaintiff left whilst in tears.

106. At no time did Plaintiff cause a distraction to his fellow workers while talking on the phone and Plaintiff told Silva that everyone uses their cubicle space to make calls and that he was being singled out and bullied by him for talking to his (male) fiancée.

107. In Plaintiff's Review for 2012, Plaintiff wrote about this event and Silva never rebutted the incident and actually signed off on the review.

108.  Prior to telling Defendant Silva that he was engaged to a man, Plaintiff used to speak on the phone at work on a daily bases to his then Italian (male) partner in Italian for many years and never once had anyone ever complained that Plaintiff was distracting them when talking on the phone.

109.  As a result of Plaintiff's complaints to Human resources against Defendant Silva, Defendant companies involuntarily removed Plaintiff from his regular position as an "A2" studio operator handling the microphones for the journalist and guest, and was placed in training in a different area utilized for entry level employees known as "MVID".

110.  Control 52 (MVID) is a room where there is no interaction with CNN journalists or guests.  Furthermore, Control Room 52 is completely different and not at all similar to the Plaintiff's prior position and job description in violation of FMLA.

111.  On or about November 2012, while assigned to a position known as the "MVID", Plaintiff was approached by a female co-worker and was asked if he was gay?  As a result, Plaintiff filed a complaint with Ms. Hutchinson at Human Resources.

112.  On November 19, 2012, Plaintiff wore a white Calvin Klein suit with a tie to work.  At some point that day, Defendant Silva sent an e-mail to Plaintiff stating that he wanted to meet with Plaintiff.  The meeting took place at Ms. Lois Cioffi's office, a CNN manager.

113.  At the meeting, Defendant Silva told Plaintiff that the white suit was "too flashy for Erin Burnett."  Plaintiff was ordered to change by Ms. Cioffi and the Plaintiff did so without protest.  The Plaintiff placed his "show blacks" as they were referred to for Erin Burnett's live show on CNN.

114.  Ms. Burnett later asked the Plaintiff "What happened to your suit?" The Plaintiff, just as a similar situation that McLoughlin lied about blaming CNN journalist Piers Morgan, Ms. Cioffi stated that his white suit and red tie was "too flashy for Erin Burnett". Ms. Burnett denied making such a comment or complaint.  This exchange was witnessed by Wil Suratt.

115.  On November 21, 2012 and continuing thereafter, Plaintiff filed numerous complaints with Defendant Silva and Clayton Sizemore advising them that there was a pattern of some CNN employee(s) placing open coffee containers and other pieces of garbage waste near the audio equipment which could result in major property damage to the equipment should the coffee spill.

116.  On December 7, 2012, Plaintiff was approached by a co-worker and told that Plaintiff's manager had spoken to the co-worker about the complaints that Plaintiff had made against his supervisors regarding his clothes.  Soon thereafter, a newspaper article appeared in the *New York Post* regarding a CNN employee who has a unique choice of attire.

117.  Said information was not giving to the newspaper by Plaintiff but rather by someone with knowledge at the Defendant's companies.  When the reporter from the Post questioned Erin Burnett's representative about the CNN employee who has a unique choice of attire, Ms. Burnett's representative stated that the show "does not have a dress code.  This is silly."

118.  On or about January 30, 2013, while Plaintiff was talking to his fiancée on the phone, he was approached by his current manager, Defendant McLoughlin (MVID) who Plaintiff had never disclosed that he was gay or had a male fiancée, and was told the he needed to speak with Plaintiff.  Plaintiff hung up the phone and the manager stated in front of Plaintiff's co-workers "you didn't have to hang up on your boy." Said reference to Plaintiff's

fiancée as "your boy" was embarrassing and humiliating to Plaintiff since he had not told McLoughlin or anyone else at his new MVID position of either his sexual orientation or his same-sex fiancée.  This comment was witnessed by Jodi Dresch.

119.  On or about February 11, 2013, Plaintiff was told by a co-worker, who saw a photo of Plaintiff near a mirror and said that Plaintiff "should not have a princess mirror in his bathroom, that's for a girl."

120.  On February 12, 2013, a worker at CNN said to Plaintiff "Look at those gay ass jeans."  This comment was made in Studio 73 during an early taping Fareed Zakaria's show "GPS".

121.  On or about February 21, 2013, Plaintiff was approached by Defendant Woodward and was told that Plaintiff could not wear headphones during his time-allotted break-time, which is considered a personal time for a CNN employee, because it makes an employee look "isolated" from the rest of the team.

122.  Other heterosexual employees would wear headphones while at CNN, some actually wore them while working during their shift such as on-air during live shows, and not time-allotted break-time as Plaintiff was. Yet when Plaintiff brought this to Ms. Woodward's attention no action was taken against the heterosexual male employees.

123.  Plaintiff pointed out to Defendant Woodward that other CNN employees have never been reprimanded for watching and using their iPad behind the set with their headphones during a live show and not wearing their mobile studio belt back.

124.  Plaintiff was singled out in retaliation for prior complaints that he made against his supervisors regarding sexual orientation harassment.

125.  It should be noted that there is no company policy which states that a CNN employee cannot wear headphones while on his or her personal break.

126.  As a result of Plaintiff's meeting with Defendant Woodward regarding her disapproval of Plaintiff wearing his headphones while on his personal break, on February 22, 2013.  Plaintiff complained to Defendant Woodward on separate occasions, that he witnessed a heterosexual co-worker in his department wearing earphones while watching a video online, clearly against the rules and policy of CNN. No action was taken by Defendant, Anne Woodward.

127.  On February 23, 2013, Plaintiff filed a complaint with Defendant CNN against Defendant, Anne Woodward for denying him H.R. representation in a meeting where she threatened Plaintiff with insubordination if Plaintiff failed to meet her one hour before his scheduled work start time.

128.  On February 26, 2013 and February 27, 2013, based on this new policy created by Defendant Woodward as of February 21, 2013, Plaintiff again informed Ms. Woodward of another co-worker who was watching video on YouTube while wearing his personal headphones on company time. Again the heterosexual co-worker was never reprimanded like Plaintiff and was not asked to stop watching videos after the Plaintiff reported the matter.

129.  On February 28, 2013, Plaintiff informed Defendants Woodward and McLoughlin that he had knowledge of a heterosexual co-worker drinking while at work and submitted a photo of the co-worker drinking alcohol while performing his duties as a camera man. Said photo was provided to Defendant Woodward. Upon information and belief no action was taken against this heterosexual individual.

130.  On March 21, 2013 the photo was eventually given to and placed in a "paper shredder" by Ms. Maureen DuMond on the 4th floor's pantry room which is located in the close vicinity of the CNN-NY Human Resources department.  Said shredding was observed by the Plaintiff  while Ms. Dumond laughed with a manager in the CNN-NY department, Ms. Lois Cioffi.

131.  On March 11, 2013, Plaintiff filed a complaint with Defendant CNN against Defendant Silva who ordered Plaintiff, in an angry tone of voice, to change out of his red tracksuit that he wore to work, in the presence of Anderson Cooper, a CNN news journalist.

132.  CNN journalist, Anderson Cooper, as he witnessed the event of bullying ensued by Defendant Silva questioned the Plaintiff, with Silva in the room (Studio 73) and asked "What is going on here?" The Plaintiff stated if he [Cooper] had any questions, he could ask his supervisor [Silva].

133.  Mr. Cooper stated he was confused as to why the Plaintiff was told by Defendant Silva that his clothing attire was inappropriate.  Mr. Cooper wanted to know more of the story and once Silva ran out of the studio before Mr. Cooper could question him, Mr. Cooper gave the Plaintiff his personal, Company alias email address and asked the Plaintiff to email him with the details of the nature of being bullied by his supervisor, Defendant Silva.

134.  Plaintiff did not argue and without hesitation changed his clothes.

135.  Said comment and tone was inappropriate and caused Plaintiff embarrassment because it was said in front of Mr. Cooper who came over to Plaintiff and expressed his disagreement with Defendant Silva's comment.

136.  Plaintiff was later approached by another CNN journalist, Erin Burnett who also disapproved of Mr. Silva's conduct towards Plaintiff regarding the ordering of his tracksuit removal. No action was taken by Defendant CNN against Defendant Silva regarding this incident.

137.  On March 12, 2013, Plaintiff filed a complaint with Defendant McLoughlin advising him that Plaintiff had noticed one of his colleagues in their department looking for a place to nap behind the Christiane Amounpour's show.  No action was ever taken by Defendant McLoughlin.

138.  On March 13, 2013, Plaintiff filed a complaint with H.R. for his supervisor, Defendant Silva's failure to approve his overtime from October 18, 2012.

139.  On March 21, 2013, Plaintiff was scheduled by Defendant CNN Management to work a shift of 12:30 a.m. to 8:30 p.m. after having worked on March 20, 2013 a shift of 12:30 p.m. to 8:30 a.m. This left Plaintiff with only a four hour break between these two shifts.

140.  Plaintiff arrived for work at CNN on March 21, 2013 at 12:30 a.m.

141.  At approximately 4:00 a.m. on March 21, 2013, Supervisor Lawrence Van Patten spoke with Plaintiff without ever questioning Plaintiff as to why he was working so early in the morning.

142.  On March 21, 2013, Plaintiff filed a complaint alerting CNN that a few co-workers had engaged in improper conduct while at work specifically the use of the internet to watch movies while on duty. Said individuals, upon information and belief, were heterosexual and never filed a complaint against their supervisors.

143.   Upon information and belief no action was taken against said co-workers.

144.   On March 21, 2013 at approximately 2:15 p.m., 14 hours into Plaintiff's shift, he was approached by Lois Cioffi, Director of Control Rooms Operations, requesting that Plaintiff see her in her office. Ms. Cioffi proceeded to verbally reprimand Plaintiff for having come to work at 12:30 a.m. She informed Plaintiff that there was an error on the schedule and it should have read that Plaintiff's start time was "12:30 p.m."

145.   Rather, then blaming the manager who created the schedule, Ms. Cioffi blamed Plaintiff for the error and insinuated that Plaintiff was "stupid." Ms. Cioffi raised her voice and spoke to Plaintiff in a hostile and demeaning manner. Plaintiff was then ordered to leave the building immediately and told that she would inform Plaintiff as to whether or not Plaintiff would be placed on the schedule to work the next day (March 22, 2013).

146.   On March 22, 2013, Plaintiff filed a complaint with Defendant Time Warner regarding Ms. Cioffi's conduct.

147.   Since Plaintiff revealed the fact of his sexual orientation, engagement to a man and the filing of complaints to H.R. and management at CNN, Plaintiff was removed on several occasions from working inside the studios and the CNN journalists.

148.   Since Plaintiff revealed the fact of his sexual orientation, engagement to a man and the filing of complaints to H.R. and management at CNN Plaintiff had been reassigned by Defendants Silva and McLoughlin to areas in which Plaintiff would be kept away from the journalists and viewed as a position demotion or entry-level position.

149.   When Plaintiff was involuntarily reassigned his position as an "A2" was taken by Heterosexual colleagues whom plaintiff had trained with little experience.

26

150. On June 6, 2013, Plaintiff had colon surgery and as a result, could not endure prolonged periods of time sitting which Plaintiff's new assignment at Control 52 required.

151. As such Plaintiff was forced to go on medical leave under the Family and Medical Leave Act ("FMLA") due to the inability to sit for long periods of time and asked for a reasonable accommodation upon his return to a position were sitting is not required.

152. On June 17, 2013, Plaintiff returned to work after his surgery at which time he was assigned to a different location rather than his prior position in the studio ("A2") in violation of FMLA. Said new post required different working conditions. Plaintiff asked for a reasonable accommodation to go back to his regular position as an "A2" microphone operator which required him to stand.  Said request was denied by Defendant CNN.

153. Furthermore, as a result of his surgery Plaintiff had to attend to his afflicted area every couple of hours because of the sitting position since Defendants refused to transfer him back to "A2".

154. On June 18, 2013, Plaintiff was called in to speak with his supervisor, defendant Silva, as to why Plaintiff was not at Control 52.  Plaintiff informed Defendant Silva that he was not assigned on the CNN grid (a video chart that informs CNN employees of their daily assignments). Defendant Silva responded that Plaintiff was on the grid. Plaintiff discovered that his name was entered into the grid minutes before his meeting with Defendant Silva but was never actually present on the grid for approximately five and a half hours of Plaintiff's workday based on Plaintiff viewing the grid continuously throughout the day.

155. After Defendant Silva put Plaintiff's name on the grid, minutes before their meeting, Defendant Silva tried to accuse plaintiff of not being at his alleged assigned post.

156.   Defendant Silva unjustly attempted to blame Plaintiff for his and/or other CNN manager's mistake in retaliation for having filed complaints against him and other CNN mangers.

157.   Shortly thereafter, Plaintiff met with Ms. Josette Sprott, CNN's New York Manager of Human Resources, to discuss not being in the studio because his name did not appear on the grid and not receiving a reasonable accommodation due to his surgery.

158.   On June 18, 2013, Plaintiff sent an email to Defendants Silva and McLoughlin advising them that while he was being trained at Control 52, his colleagues were watching movies and videos online rather than being trained by them.

159.   June 18, 2013, was the last day Plaintiff physically worked at CNN.

160.   On June 19, 2013, Plaintiff received a voice message on his phone from Ms. Sprott, informing Plaintiff that it was not necessary to come to work that day and to take some time off in order to recuperate from his surgery based on their conversation the day before regarding a reasonable accommodation.

161.   Due to the voice message left by Ms. Sprott, Plaintiff did not go in to work on June 19, 2013.

162.   Plaintiff did go to CNN office on June 19, 2013 simply to submit a copy of his marriage certificate to H.R. Department in order to place his husband on his health plan which is customary done by the heterosexual CNN employees.

163.   Upon arrival at CNN Office on June 19, 2013, Plaintiff attempted to enter the building utilizing his security pass and was informed by the security guard that the pass was "deactivated from June 18-24, 2013" without Plaintiff's knowledge. Plaintiff informed the guard that this had to be a mistake and to check the computer system.  The guard

checked and found that Plaintiff was in fact a CNN employee and allowed Plaintiff to enter and proceed into the building.

164.   Plaintiff proceeded to go to the fifth floor where Plaintiff's male spouse received a CNN guest pass as a visitor. They then proceeded to go to down to the fourth floor where H.R. is located.

165.   On the Fourth Floor, Plaintiff and his male spouse were confronted by Plaintiff's current supervisor Defendant McLoughlin, Director of Studio Operations. Defendant McLoughlin immediately asked "How did you get in the building?" Plaintiff informed him that security had allowed both his husband and Plaintiff to enter the building both in the lobby area (Time Warner's security) and again on the Fifth floor (CNN's security).

166.   Plaintiff explained to Defendant that he was just going to the H.R. Department to submit some personal documents they needed for his and his husband's health benefits.

167.   Plaintiff was told for the first time that Defendant McLoughlin placed a "Block" on Plaintiff's security card in order to keep Plaintiff out of the building without Plaintiff's knowledge.

168.   Defendant McLoughlin, in an angry tone of voice, and in the presence of Plaintiff's husband, stated that Plaintiff was not to enter the building and that Plaintiff was allegedly told by H.R. that he was prohibited from coming to the building on June 18, 2013.

169.   Plaintiff informed Defendant McLoughlin that this was not true and that he was only told that "it was not necessary to come to work today," believing that he was being given some extra time off due to his surgery and the request for reasonable

29

accommodation so that Plaintiff can obtain medical information that H.R. needs, per the message that was left on his phone by Ms. Sprott.

170.   At no time was Plaintiff ever told that he was not permitted to enter the building or the CNN offices nor was the word "prohibited" ever used by anyone at CNN other than Defendant McLoughlin.

171.   Plaintiff was escorted out of the building by Defendant McLoughlin with three security guards in tow and felt like a criminal.  Plaintiff was never charged with Trespassing.

172.   Defendant McLoughlin refused to allow Plaintiff to submit personal and confidential documents to H.R. and demanded that Plaintiff give him the documents.  As such, Plaintiff was unable to submit the documents to H.R. for his health benefit changes.

173.   Soon thereafter on June 19, 2013, Plaintiff filed a complaint with Defendant Time Warner against Defendant McLoughlin regarding the incidents that took place that day.

174.   On June 24, 2013 Plaintiff emailed Ms. Janet Sheskin, CNN New York Director of Human Resources, in order to confirm that he was to return to work on June 25, 2013, for the 11:30 a.m.-7:30 p.m. shift. Plaintiff was told by Ms. Sheskin that their review of his reasonable accommodation request was not concluded and that Plaintiff should continue to remain out of the office for the rest of the week until June 28, 2013 when a decision would be made.

175.  On June 25, 2013, Defendant Time Warner terminated all health benefits of Plaintiff's husband only days after his diagnosis of HIV was reported by his doctor while Plaintiff was still an employee of defendants in violation of New York State Labor Law §195.

176.  Due to Plaintiff's sexual orientation and complaints that he filed against defendants and co-workers, Plaintiff's request for a reasonable accommodation was never granted.

177.  Plaintiff complained to management about the hostile work environment all to no avail.

178.  On July 1, 2013, Plaintiff received a phone call from Ms. Sheskin and Defendant Woodward, Vice President of CNN'S Studio Operations, at which time Plaintiff was told by Defendant Woodward that he had been terminated from Defendant Companies.

179.  Plaintiff was never given a legitimate reason as to why he was terminated, since he had excellent evaluations.

180.  To this day Plaintiff has never received an exit interview.

181.  Plaintiff has always received exceptional evaluations as an employee of Defendants.  During the approximate 12 years that he worked for the Defendants, Plaintiff has volunteered numerous hours on behalf of the Defendant companies without ever receiving any acknowledgement from Defendants.  However, other heterosexual co-workers, i.e. "Roger", have received verbal congratulations for their volunteering work.

182.  Plaintiff was never provided an opportunity to retrieve his personal belongings from his locker at CNN, rather his locker was broken into by CNN employees and his personal belongings were mailed to be him.

183. On or about July 1, 2013, Defendants for the first time gave out to all employees a written Dress Code.

184. Plaintiff's position was filled by a heterosexual male co-worker.

185. The aforementioned incidences became a matter of public knowledge at the work place rather than remaining confidential by Defendants.

186. CNN management engaged in retaliatory, harassing and discriminatory behavior for the sole purpose of intimidating Plaintiff because of his complaints to H.R. against his supervisors and co-workers and because of his sexual orientation.

187. The Defendants retaliated against Plaintiff for opposing what he believed to be unlawful discrimination based on his sexual orientation.

188. The retaliatory conduct and actions of the Defendants resulted in a hostile work environment.

189. Plaintiff was discriminated based on his non-conformity with gender stereotypes. Plaintiff faced adverse employment actions as a result of Defendants animus toward his exhibition of behavior considered to be stereotypically inappropriate for his gender.

190. Plaintiff was treated differently because he refused to act in conformity with male stereotypes.

191. Commencing upon the first day that Plaintiff informed his supervisor Silva that he was gay, Plaintiff was subjected to inappropriate comments about his sexual orientation and relationship with his husband which affected the terms and conditions of his employment by creating a hostile work environment.

192.  As a result of the hostile work environment caused by the discrimination and retaliation, Plaintiff has been under the care of a psychiatrist and continues to be treated.

193.  Plaintiff was subjected to an impermissible and unrelenting pattern and practice of discrimination, hostile work environment and retaliation by co-workers and Defendants based upon his sexual orientation and in retaliation for Plaintiff's exercise of his right to complain and whistle blowing.

## AS AND FOR PLAINTIFF'S FIRST CLAIM AGAINST DEFENDANTS COMPANIES PURSUANT TO VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT, AS AMENDED, BASED UPON RETALIATION

194.  Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "193" above, as if fully set forth herein.

195.  Defendants discriminated against Plaintiff by engaging in severe and pervasive activities constituting gender discrimination, including, but not limited to, engaging in, condoning and tolerating unfair and sexually motivated actions against homosexual employees within CNN and discrimination against Plaintiff with respect to the terms, conditions and privileges of his employment.  The cumulative effect of Defendants' conduct created an abusive, offensive and contaminated work atmosphere.

196.  Plaintiff is protected from retaliation by making it unlawful for Defendants to discriminate against him because he possessed a good faith and reasonable belief that the defendants conduct was unlawful and he opposed the practices of the defendants by making complaints and participated in investigations which are protected activities.

197.  Plaintiff suffered adverse employment actions by being involuntarily transferred, denied a reasonable accommodation, and terminated.

33

198. There exists a causal connection between the protected activity and the adverse employment actions.

199. The named Defendant Companies condoned, tolerated and undertook these unlawful actions while acting in their individual and professional capacities as Plaintiff's employers and/or supervisors.

200. By engaging in the acts set forth in the preceding paragraphs, Defendant Companies engaged in an unlawful employment practice as defined by 42 U.S.C. § 2000e-2.

201. As a result of the foregoing, Plaintiff has suffered injury and incurred damages because of the denial of career opportunities and privileges arising from his employment with Defendants; the denial of a safe and hostile-free environment; and the embarrassment, humiliation and mental and emotional distress and financial loss as a consequence of Defendants' actions.

202. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

### AS AND FOR PLAINTIFF'S SECOND CLAIM AGAINST DEFENDANT COMPANIES PURSUANT TO VIOLATIONS OF TITLE VII - GENDER PLUS

203. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "202" above, as if fully set forth herein.

204. The Defendant Companies have discriminated against the Plaintiff on the basis of Plaintiff's gender plus his sexual orientation.

34

205. The Plaintiff was subjected to a hostile work environment which manifested itself in adverse action taken against him.

206. The Plaintiff has established that the Defendants engaged in a pattern and practice of discrimination in the manner in which the plaintiff was treated.

207. The Plaintiff was treated in a disparate manner as compared to other employees.

208. The treatment of the plaintiff was so severe and pervasive as to alter the terms and conditions of the Plaintiff's employment.

209. A motivating factor for the treatment of the Plaintiff was his gender.

210. The Plaintiff has been caused to suffer severe emotional and economic damages as a result of this conduct.

211. The Plaintiff has been unlawfully terminated due to his complaints that he filed with the H.R. Department of the Defendant Companies as set forth herein.

212. The Defendants have discriminated against the Plaintiff with respect to his employment terms, working conditions, and privileges of employment in violation of Title VII of the Civil Rights Act of 1964.

213. But for the Plaintiff's gender, the Plaintiff would not have been subjected to discrimination.

214. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

## AS AND FOR PLAINTIFF'S THIRD CLAIM AGAINST
## DEFENDANTS PURSUANT TO VIOLATIONS OF TITLE VII OF
## THE CIVIL RIGHTS ACT, AS AMENDED, BASED UPON RETALIATION

215.  Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "214" above, as if fully set forth herein.

216.  Based upon the above, Plaintiff was discriminated against by Defendants by being forced to endure continued and repeated harassment.

217.  The Defendants intentionally and willfully harassed Plaintiff and permitted Plaintiff to be harassed in employment by retaliating against Plaintiff for exercising his lawfully protected right to formally complain of Defendants' discrimination.  Defendants retaliated against Plaintiff by denying him of the conditions, terms and privileges of his employment. The cumulative effect of Defendants' conduct created an abusive, offensive and contaminated work atmosphere.

218.  By engaging in the acts set forth in the preceding paragraphs, the named Defendants engaged in an unlawful employment practice as defined by 42 U.S.C. § 2000e-3 (a).

219.  As a result of the foregoing, Plaintiff has suffered injury and incurred damages because of the denial of career opportunities and privileges arising from his employment with Defendants; the denial of a safe and hostile-free environment; and the embarrassment, humiliation and mental and emotional distress and financial loss as a consequence of Defendants' actions.

220.  Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

## AS AND FOR PLAINTIFF'S FOURTH CLAIM AGAINST
## DEFENDANT COMPANIES PURSUANT TO VIOLATIONS OF TITLE VII OF
## THE CIVIL RIGHTS ACT, AS AMENDED, BASED UPON
## HOSTILE WORK ENVIRONMENT

221.  Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "220" above, as if fully set forth herein.

222.  Defendants engaged in activities which created a hostile working environment for Plaintiff, including but not limited to:  subjecting Plaintiff to offensive and derogatory comments; unwarranted criticisms and complaints; embarrassment and humiliation; and refusing to respond to Plaintiff's demands to cease and desist said discrimination and harassment.

223.  The named individual Defendants acted in their individual and professional capacities.   No significant action was taken by Defendant Companies to stop the harassment of Plaintiff, thereby contributing to a hostile work environment.

224.  By engaging in the acts set forth in the preceding paragraphs, Defendants engaged in an unlawful employment practice as defined by 42 U.S.C. § 2000e-2 for which they are liable.

225.  As a result of the foregoing, Plaintiff has suffered injury and incurred damages because of the denial of career opportunities arising from his employment with Defendants and the embarrassment, humiliation and mental and emotional distress and financial loss as a consequence of Defendants' actions.

226.  Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

### AS AND FOR PLAINTIFF'S FIFTH CLAIM AGAINST
### DEFENDANT COMPANIES PURSUANT TO VIOLATIONS
### OF AMERICANS WITH DISABILITY ACT (ADA)

227.  Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "226" above, as if fully set forth herein.

228.  At all relevant times, Plaintiff has been an individual with a disability within §3(2) of the Americans with Disabilities Act, 42 U.S.C. §12102(2).  More particularly, Plaintiff had a physical impairment that substantially limits one or more of his major life activities, has a record of such an impairment, and/or is regarded by defendants as having such an impairment.

229.  Plaintiff is a qualified individual with a disability as that term is defined in §101(8) of the ADA, 42 U.S.C. §12111(8).  More specifically, Plaintiff is an individual with a disability who, with reasonable accommodation, can perform the essential functions of his job.

230.  Defendants are and were Plaintiff's employer and is covered by the terms of the ADA

231.  Defendants have refused to make a reasonable accommodation to Plaintiff.

232.  Defendants have altered the terms and conditions of Plaintiff's employment because of his disability, to including forcing him to file a complaint with Defendant's H.R. department.

233.  Defendants' failure to make reasonable accommodations to plaintiff's physical disability and their disparate treatment of the plaintiff constitutes discrimination against Plaintiff with respect to the terms, conditions, or privileges of employment.  Defendants

38

actions constitute a violation of Section 102(b)(5)(A) of the ADA, 42 U.S.C. §12112(b)(5)(A).

234. Defendants acted with malice or with reckless indifference to the federally protected rights of plaintiff.

235. As a direct and proximate result of Defendants' discrimination on the basis of disability Plaintiff has suffered lost wages and benefits and lost employment opportunities due to his subsequent termination on July 1, 2013.

236. Defendants' failure to make a reasonable accommodation to Plaintiff has caused, continues to cause, and will cause plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, as well as other non-pecuniary losses.

237. As a consequence of Defendants' unlawful employment practices, Plaintiff is entitled to compensatory damages in the amount of FIVE MILLION ($5,000,000.00) DOLLARS together with interest.

## AS AND FOR AS AND FOR PLAINTIFF'S SIXTH CLAIM
## AGAINST DEFENDANTS PURSUANT TO VIOLATIONS OF
## NEW YORK STATE EXECUTIVE LAW § 296 BASED UPON GENDER PLUS

238. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "237" above, as if fully set forth herein.

239. The Defendants have discriminated against the Plaintiff on the basis of Plaintiff's gender and sexual orientation.

240. The Plaintiff was subjected to a hostile work environment which manifested itself in adverse action taken against him.

241. The Plaintiff has established that the Defendants engaged in a pattern and practice of discrimination in the manner in which the Plaintiff was treated.

242. The Plaintiff was treated in a disparate manner as compared to other employees.

243. The treatment of the Plaintiff was so severe and pervasive as to alter the terms and conditions of the Plaintiff's employment.

244. A motivating factor for the treatment of the Plaintiff was his gender and sexual orientation.

245. The plaintiff has been caused to suffer severe emotional and economic damage as a result of this conduct.

246. The Plaintiff was terminated as a result of complaining to the H.R. department.

247. The defendants have discriminated against the Plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of N.Y. Executive Law §290 et seq.

248. But for the Plaintiff's gender and sexual orientation, the Plaintiff would not have been subjected to discrimination.

249. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

### AS AND FOR PLAINTIFF'S SEVENTH CLAIM AGAINST DEFENDANTS
### PURSUANT TO VIOLATIONS OF NEW YORK STATE
### EXECUTIVE LAW § 296 BASED UPON SEXUAL HARASSMENT

250. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "249" above, as if fully set forth herein.

251. Defendants, in their individual and professional capacities, discriminated against Plaintiff by engaging in activities constituting sexual harassment of including but not limited to: condoning, tolerating and engaging in sexually suggestive, lewd and vulgar comments; and unwelcome and offensive touching. Defendants engaged in discrimination against the Plaintiff, with respect to terms, conditions and privileges of employment. Named Defendants undertook these actions while acting in their individual and professional capacities as Plaintiff's employers and/or supervisors.

252. As a result of this sexual harassment Plaintiff suffered adverse employment action which eventually resulted in the constructive termination of his employment.

253. By engaging in the actions set forth in the preceding paragraphs, Defendants engaged in an unlawful discriminatory practice, as defined by New York Executive Law § 296 1(a).

254. As a result of the foregoing, Plaintiff has suffered injury and incurred damages because of the denial of career opportunities arising from his employment with the Defendants, the constructive termination of his employment and has also suffered embarrassment, humiliation and mental and emotional distress financial loss as a consequence of the Defendants' actions.

255. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

**AS AND FOR PLAINTIFF'S EIGHTH CLAIM AGAINST DEFENDANTS
PURSUANT TO VIOLATIONS OF NEW YORK STATE
<u>EXECUTIVE LAW § 296 BASED UPON RETALIATION</u>**

256.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "255" above, as if fully set forth herein.

257.   Defendants engaged in activities constituting retaliation against Plaintiff for his complaints and in opposition to the sexual harassment and discrimination of Plaintiff, including but not limited to:  subjecting the Plaintiff to physical and verbal abuse; false accusations against him professionally; derogatory comments; abuse and hostility; unwarranted criticisms and complaints; embarrassment and humiliation in front of other employees; and refusing to respond to Plaintiff's demands to cease and desist the discrimination and sexual harassment.   Named Defendants, in their individual and professional capacities, retaliated against Plaintiff because he opposed practices made unlawful by New York Law Executive Law § 296.

258.   By engaging in the acts set forth in the preceding paragraphs, Defendants engaged in an unlawful employment practice as defined by New York Executive Law § 296(1) for which they are liable.

259.   As a result of the foregoing, the Plaintiff has suffered injury and incurred damages because of the denial of career opportunities arising from his employment with the Defendants and ultimately, the constructive termination of his employment and has also suffered embarrassment, humiliation and mental and emotional distress and financial loss as a consequence of the Defendants' actions.

260. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).


**AS AND FOR PLAINTIFF'S NINTH CLAIM AGAINST
DEFENDANTS PURSUANT TO VIOLATIONS OF
NEW YORK STATE EXECUTIVE LAW § 296
BASED UPON HOSTILE ENVIRONMENT**

261. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "260" above, as if fully set forth herein.

262. Defendants engaged in activities which created a hostile working environment for Plaintiff including but not limited to: subjecting the Plaintiff to physical and verbal abuse; false accusations against him professionally; derogatory comments; abuse and hostility; unwarranted criticisms and complaints; embarrassment and humiliation in front of other employees; and refusing to respond to Plaintiff's demands to cease and desist.

263. Named Defendants acted in their individual and professional capacities.

264. By engaging in the acts set forth in the preceding paragraphs, Defendants engaged in an unlawful employment practice as defined by New York Executive Law § 296(1) for which they are liable.

265. As a result of the foregoing, the Plaintiff has suffered injury and incurred damages because of the denial of career opportunities arising from his employment with the Defendants and ultimately, the constructive termination of his employment and has also suffered embarrassment, humiliation and mental and emotional distress and financial loss as a consequence of the Defendants' actions.

266. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

## AS AND FOR PLAINTIFF'S TENTH CAUSE OF ACTION BASED ON NEW YORK CITY ADMINISTRATIVE CODE BASED ON GENDER PLUS

267. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "266" above, as if fully set forth herein.

268. The Defendants have discriminated against the Plaintiff on the basis of Plaintiff's gender and sexual orientation.

269. The Plaintiff was subjected to a hostile work environment which manifested itself in adverse action taken against him.

270. The Plaintiff has established that the Defendants engaged in a pattern and practice of discrimination in the manner in which the Plaintiff was treated.

271. The Plaintiff was treated in a disparate manner as compared to other employees.

272. The treatment of the Plaintiff was so severe and pervasive as to alter the terms and conditions of the Plaintiff's employment.

273. A motivating factor for the treatment of the Plaintiff was his gender and sexual orientation.

274. The plaintiff has been caused to suffer severe emotional and economic damage as a result of this conduct.

275. The Plaintiff was terminated as a result of complaining to the H.R. department.

276. The defendants have discriminated against the Plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of N.Y.C. Administrative Code §8-107.

277. But for the Plaintiff's gender and sexual orientation, the Plaintiff would not have been subjected to discrimination.

278. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

## AS AND FOR PLAINTIFF'S ELEVENTH CLAIM AGAINST DEFENDANTS PURSUANT TO VIOLATIONS OF NEW YORK CITY ADMINISTRATIVE CODE BASED UPON RETALIATION

279. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "278" above, as if fully set forth herein.

280. Defendants engaged in activities constituting retaliation against Plaintiff for his complaints and in opposition to the sexual harassment and discrimination of Plaintiff, including but not limited to:  subjecting the Plaintiff to physical and verbal abuse; false accusations against him professionally; derogatory comments; abuse and hostility; unwarranted criticisms and complaints; embarrassment and humiliation in front of other employees; and refusing to respond to Plaintiff's demands to cease and desist the discrimination and sexual harassment.   Named Defendants, in their individual and professional capacities, retaliated against Plaintiff because he opposed practices made unlawful by New York City Law.

281. By engaging in the acts set forth in the preceding paragraphs, Defendants engaged in an unlawful employment practice as defined by New York City Administrative Code § 8-107 for which they are liable.

282. As a result of the foregoing, the Plaintiff has suffered injury and incurred damages because of the denial of career opportunities arising from his employment with the Defendants and ultimately, the constructive termination of his employment and has also

suffered embarrassment, humiliation and mental and emotional distress and financial loss as a consequence of the Defendants' actions.

283. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

### AS AND FOR PLAINTIFF'S TWELFTH CLAIM AGAINST DEFENDANT, SILVA, McLOUGHLIN, AND WOODWARD FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

284. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "283" above, as if fully set forth herein.

285. Defendants, Silva, McLoughlin, and Woodward, were aware that Plaintiff was extremely uncomfortable with the behavior and comments being made by them and/or co-workers and was completely demeaned by their actions and language.

286. Defendant, Silva, McLoughlin, and Woodward, were in a position of power and control over Plaintiff and set on a malicious, extreme and outrageous course of action to intentionally cause Plaintiff severe emotional distress.

287. As a direct and proximate result of this extreme and outrageous conduct, Plaintiff suffered extreme emotional distress humiliation, embarrassment, physical illness, loss of employment and other monetary damages.

288. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

**AS AND FOR PLAINTIFF'S THIRTEENTH CLAIM AGAINST DEFENDANTS,**
**FOR PENDANT STATE COMMON LAW CLAIM- RESPONDEAT SUPERIOR**

289. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "288" above, as if fully set forth herein.

290. At all relevant times, Defendants and their agents and employees were acting for, upon and in furtherance of the business of their employer and supervisor, and within the scope of their tortuous acts that were the proximate cause of Plaintiff's injuries.

291. Because of the foregoing, Plaintiff has been damaged in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Honorable Court grant the following relief:

1.      Declaring that the aforementioned actions of the Defendants are unconstitutional and are in violation of the United States Constitution, Title VII of the Civil Rights Act of 1964, as amended, the First Amendment, New York State Executive Law § 296, New York State Labor Law, New York State Common Law, New York City Administrative Code and granting the Plaintiff, WILLIAM KANE, money damages in the amount of no less than FIVE MILLION DOLLARS ($5,000,000.00) in damages in an amount to be proven at trial for each cause of action "First" thorough "Thirteenth";

2.      Granting Plaintiff an award of Punitive Damages for each cause of action;

3.      Granting Plaintiff all costs for this action, including reasonable attorneys fees incurred by Plaintiff; and

4.      Granting the Plaintiff such other and further relief as may be just.

## JURY TRIAL

The Plaintiff requests a jury trial on all questions of fact raised by the Complaint.

Dated:  Lake Success, New York
        May 21, 2014

Yours, etc.

AVALLONE & BELLISTRI, LLP

By: _____

Rocco G. Avallone
Attorneys for Plaintiff
3000 Marcus Avenue, Suite 3E7
Lake Success, New York 11042
(516) 986-2500